FILED

2008 JUL -3 PM 2: 21

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
SANTA ANA

BY_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

October 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>BRAD KEITH LEE,<br>STEPHEN T. HARD, and<br>NORMAN EDWARD KURBAN,<br>    aka Jedd Kurban,<br><br>              Defendants. | NO. SA CR 08 - 00177<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 371: Conspiracy;<br>18 U.S.C. § 1343: Wire Fraud;<br>18 U.S.C. § 2: Aiding and<br>Abetting] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

A.    INTRODUCTION

At all times relevant to this Indictment:

1.    Defendant BRAD KEITH LEE was a resident of La Jolla, California.

2.    Defendant STEPHEN T. HARD was a resident of Salt Lake City, Utah, and an attorney admitted to the Utah Bar.

3.    Defendant NORMAN EDWARD KURBAN, aka Jedd Kurban, was a resident of Los Angeles, California.

4.   The Consolidated Consulting Group ("C.C.G.") was a California corporation, whose officers were A.S., M.T., and H.B. (the "C.C.G. officers").

5.   A "High Yield Investment Program" (HYIP) is a general term given to fraud schemes that are known by various specific names, including "Prime Bank Guarantees," "Prime Bank Debenture Programs," "Medium Term Note Trading Programs," and "Roll Programs."   Such programs do not exist as legitimate investment vehicles.   In these schemes, the fraud perpetrator claims to have privileged access to secret financial trading programs, which are falsely represented to be sanctioned by the U.S. Federal Reserve Bank, the U.S. Treasury Department, the World Bank, or some other entity involved in international monetary transactions or policy. Claims are typically made that a privileged few are invited to participate in the trading of some form of bank security such as bank guarantees, notes, stocks, or debentures, which can be bought at a discount and sold at a premium. It is often claimed that there are only a few "traders" or "commitment holders" in the world who are authorized to resell these bank securities between the top 25 or 50 banks in the world, often falsely referred to as "Prime Banks."   By conducting multiple "trades" in rapid succession, they claim to be able to produce extraordinary rates of returns, far beyond any normal investment.   It is often further claimed that one of the primary reasons these trading programs exist is to generate funds for humanitarian purposes and that a portion of the investor's profits must be used to provide humanitarian relief and aid somewhere.

6.   Perpetrators of HYIPs claim that a high degree of secrecy is required of the unsuspecting investor in order to participate in the program, and require the execution of various documents which have no meaning in legitimate financial transactions.   Typically, the investor first is directed to provide a "Letter of Intent," a "Non-Solicitation Agreement," a "Confidentiality Agreement," a "Non-Circumvention Letter," a "Bank Proof of Funds," a "Client Information Summary," and a copy of the investor's passport.   The investor is typically told that he must go through "compliance," which will purportedly be done by the Federal Bureau of Investigation (FBI), Central Intelligence Agency (CIA), Federal Reserve Bank (Fed) or some other government "compliance officer."   The investor is also told that his funds must be verified on a "bank to bank" basis to make sure that they do exist and that the funds must be "good, clean, clear funds of non-criminal origin."   The investor typically is assured that his funds are absolutely safe and never at risk in any way.   The scheme is designed to gradually progress to its ultimate goal, which is for the defendants to gain control of all or a portion of the investor's funds which are then stolen by the fraud perpetrators.

B.   THE CONSPIRACY

Beginning in or around August 2004, and continuing to in or around August 2005, in Orange County, within the Central District of California and elsewhere, defendants LEE, HARD, and KURBAN, ("defendants"), and others known and unknown to the Grand Jury, conspired and agreed with each other, to knowingly and

1    intentionally commit wire fraud in violation of Title 18, United
2    States Code, Section 1343.

3    C.    THE PURPOSE OF THE CONSPIRACY

4         It was the purpose of the conspiracy that the defendants
5    would unjustly enrich themselves through the promotion of a
6    fraudulent high yield investment scheme promising extremely high
7    returns at little or no risk to principal.

8    D.    MANNER AND MEANS OF THE CONSPIRACY

9         The manner and means through which the purpose of the
10   conspiracy was to be accomplished in substance were as follows:

11        7.   It was a part of the conspiracy that defendant LEE, in
12   order to develop credibility and trust, would and did falsely
13   claim to the C.C.G. officers to be a retired general in the
14   United States Army.

15        8.   It was a further part of the conspiracy that defendants
16   would and did claim to the C.C.G. officers that defendant LEE and
17   C.C., as LEE's asset manager, had experience in buying and
18   selling medium term notes, bank guarantees, and other financial
19   instruments.

20        9.   It was a further part of the conspiracy that defendant
21   LEE would and did falsely represent to the C.C.G. officers that
22   he had access to High Yield Investment Programs that could yield
23   between 20% to 100% per week at no risk.

24        10.  It was a further part of the conspiracy that defendants
25   LEE and HARD would and did falsely represent to the C.C.G.
26   officers that LEE had successfully closed previous deals in which
27   extraordinary rates of return were realized by other investors.

28

4

11.   It was a further part of the conspiracy that defendant KURBAN, in order to give credibility to LEE's claims, would and did falsely vouch for LEE's purported past successes in obtaining such high yields on investments.

12.   It was a further part of the conspiracy that defendants would and did use HARD's position as an attorney and C.C.'s position as a so-called Swiss banker to give their fraudulent scheme the appearance of legitimacy and credibility.

13.   It was a further part of the conspiracy that defendants, in an attempt to give the appearance of legitimacy, would and did prepare and execute a Joint Venture Agreement with the C.C.G. officers that set forth the terms of the investment program.

14.   It was a further part of the conspiracy that defendants LEE and HARD would and did direct the C.C.G. officers to wire funds to HARD's attorney trust account, from which HARD would then transfer the funds to an offshore account held by C.C. for, supposedly, ultimate placement into the proposed high yield investment.

15.   It was a further part of the conspiracy that when defendants would fail to provide the promised returns, defendants attempt to lull the C.C.G. officers into not going to law enforcement authorities by, among other things,

a.   Falsely representing that the investment funds remained intact and secure in C.C.'s account;

b.   Falsely representing that the delays currently being encountered were nothing unusual;

5

c.   Falsely representing that progress was being made toward completion of the investment;

d.   Falsely agreeing to make a payment by a time certain that was falsely represented to be interest generated from the investment; and

e.   Falsely agreeing to return the investment funds.

16.   It was a further part of the conspiracy that defendants would and did divert and convert to their own personal use and benefit, or for other unauthorized purposes, the funds fraudulently obtained on behalf of C.C.G. from M.T.

E.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants and their co-conspirators committed and caused to be committed in the Central District of California and elsewhere, the following acts, among others:

17.   On or about October 14, 2004, LEE and HARD entered a "Joint Venture Agreement" with C.C.G., which provided, in part, that:

a.   C.C.G. would invest $1 million "in a private placement transaction involving the purchase and sale of bank debentures ... or other instruments;"

b.   "Lee and his asset manager(s) have expertise in the business of the purchase and sale of bank debentures (primarily medium term notes or bank guarantees) ... and will contract on behalf of this joint venture with others to allow C.C.G. to participate in private placement opportunities;"

c.   "Lee can secure lines of credit that can be

6

1  utilized for" the purpose of this investment;

2         d.    C.C.G. will transfer the $1 million to HARD's

3  trust account at U.S. Bank in Salt Lake City, whereupon HARD will

4  then transfer the funds to an account created by LEE at UBS AG in

5  London in the name of C.C., who is LEE's "asset manager;"

6         e.    LEE "shall instruct the asset manager" to obtain a

7  line of credit against the $1 million, "to use the line of credit

8  funds to obtain a one year bank guarantee" in the amount of $1

9  million, to deposit the bank guarantee into a sub-account for

10 C.C.G., and to "use the remaining line(s) of credit proceeds to

11 engage in [purchase and sale of bank debentures and other

12 instruments] as directed by LEE;"

13        f.    The $1 million "shall not be exposed to risk of

14 loss;" and

15        g.    KURBAN "shall be compensated an appropriate amount

16 by LEE."

17    18.   On or about October 18, 2004, defendants caused M.T.,

18 acting on behalf of C.C.G., to wire transfer $1 million from his

19 account at Bank of America in Walnut, California to HARD's

20 attorney trust account at U.S. Bank in Salt Lake City, Utah

21 ("attorney trust account").

22    19.   On or about October 20, 2004, HARD wire transferred $1

23 million from his attorney trust account to an account held by

24 C.C. at Union Bank of Switzerland in London ("UBS/London

25 account") "for benefit of Brad Lee;"

26    20.   On or about October 25, 2004, HARD sent an email to

27 A.S., with copies to M.T. and H.B., informing them that C.C. "has

28

received the funds" and that the "leveraging process" would begin in a few days.

21.   On or about November 5, 2004, C.C. wire transferred $25,000 from his UBS/London account to HARD's attorney trust account.

22.   On or about November 18, 2004, HARD sent A.S. an email stating that delays had developed in placing the $1 million into the investment program, but expected the trading transactions to begin in four days.

23.   On or about November 21, 2004, HARD sent A.S. an email providing further explanation for the delays in initiating the investment, indicating that the U.S. government had unexpectedly requested LEE to "enter into a very large contract that will help finance the U.S. causes," such as the Iraq war and anti-terrorism activities, and that as a result the procedures contemplated by the Joint Venture Agreement would have to be modified.   HARD further noted that "we have been at this business for a long time," and there are "always" difficulties in completing these kinds of investment transactions.

24.   On or about November 24, 2004, HARD sent A.S. another email assuring him that "nothing has happened with the $1 million that was sent to C.C.'s account pursuant to the wire transfer from my account."

25.   On or about November 27, 2004, HARD sent A.S. another email assuring him that "things are beginning to jell in a way that everyone should be happy with."

26.   On or about November 30, 2004, HARD sent A.S. another

8

email assuring him that "things are moving forward again after a delay," but that he did not yet have all the details from LEE.

27. On or about November 30, 2004, C.C. wire transferred $60,000 from his UBS/London account to HARD's attorney trust account.

28. On or about December 1, 2004, HARD sent A.S. another email assuring him that "I truly believe that everything is going to be just fine - in fact, better than just fine."

29. On or about December 6, 2004, HARD wire transferred $10,000 from his attorney trust account to LEE's account at First Republic Bank in La Jolla, California.

30. On or about December 6, 2004, LEE met with A.S., M.T., and H.B. and agreed to transfer to C.C.G., by December 10, $200,000 "of interest generated from [the] investment of $1,000,000." LEE further agreed to instruct one of his banks to open a credit line of $1 million in favor of C.C.G. during the week of December 13, 2004.

31. On or about December 23, 2004, LEE and HARD met with A.S., M.T., and H.B. and executed a Notice of Demand for the return of the $1 million by December 31 to C.C.G..

32. On or about December 29, 2004, C.C. wire transferred $300,000 from his UBS/London account to LEE's account at U.S. Bank in La Jolla, California.

33. On or about January 4, 2005, LEE promised A.S., M.T., and H.B. that they would receive the promised funds by January 6.

34. On or about January 6, 2005, HARD sent an email to A.S. informing him that, according to LEE and C.C., the funds were "en

route" to HARD's trust account, and that he would notify A.S. when they arrived.  HARD further advised A.S. that if any threatened lawsuit were filed against LEE it could delay the return of the funds and would cause LEE to "vigorously defend himself against any false claims."

35.  On or about January 9, 2005, HARD sent A.S. an email stating that C.C. had initially placed the $1 million into a money market account, which C.C. has now "liquidated in order to return the funds to you."

36.  On or about January 12, 2005, HARD sent A.S. an email advising him that the funds from C.C. had still not arrived, but assured him that his "experience with [LEE] is that what he says happens, just not in the time frame stated."

37.  On or about March 4, 2005, C.C. wire transferred $19,990 from his account in Geneva, Switzerland to an account opened by LEE in the name of Delta North America at Bank of America in San Diego, California ("Delta account").

38.  On or about April 1, 2005, C.C. wire transferred $19,990 from his account in Geneva, Switzerland to the Delta account.

39.  On or about April 7, 2005, C.C. wire transferred $25,000 from his account at Union Bank of Switzerland in Lausanne, Switzerland to the Delta account.

40.  On or about April 14, 2005, C.C. wire transferred $26,000 from his UBS/London account to the Delta account.

41.  On or about June 2, 2005, C.C. wire transferred $10,000 from his UBS/London account to the Delta account.

42.   On or about June 21, 2005, C.C. wire transferred $10,000 from his UBS/London account to the Delta account.

43.   On or about August 3, 2005, C.C. wire transferred $14,400 from his UBS/London account to the Delta account.

All in violation of Title 18, United States Code, Section 371.

COUNTS TWO through NINE

[18 U.S.C.§§ 1343 and 2]

44.   Paragraphs 1 through 6 are realleged and incorporated herein by reference, as if set forth in full.

45.   Beginning in or around August 2004, and continuing to in or around August 2005, within Orange County, in the Central District of California, and elsewhere, the defendants BRAD KEITH LEE and STEPHEN T. HARD ("defendants"), and others known and unknown to the Grand Jury, aiding and abetting each other, devised and intended to devise, and participated in a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme is described in paragraphs 7 through 16 of this Indictment, which paragraphs are incorporated herein by reference.

46.   On or about the dates listed for each count below, in the Central District of California and elsewhere, for the purpose of executing the aforesaid scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, the defendants transmitted, caused to be transmitted, and aided and abetted the transmission by means of wire communications in interstate and foreign commerce, the following writings, signs, signals, and sounds:

12

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| 2 | 10/18/04 | Wire transfer of $1,000,000 from an account at the Bank of America in Walnut, California to defendant HARD's attorney trust account, number xxxxx437, at U.S. Bank in Salt Lake City, Utah |
| 3 | 11/21/04 | Email by defendant HARD from s.t.hard@att.net to A.S. in Anaheim, California through the web-based email provider America Online in Dulles, VA |
| 4 | 11/22/04 | Email by defendant HARD from s.t.hard@att.net to A.S. in Anaheim, California through the web-based email provider America Online in Dulles, Virginia |
| 5 | 11/24/04 | Email by defendant HARD from s.t.hard@att.net to A.S. in Anaheim, California through the web-based email provider America Online in Dulles, Virginia |
| 6 | 12/01/04 | Email by defendant HARD from s.t.hard@att.net to A.S. in Anaheim, California through the web-based email provider America Online in Dulles, Virginia |
| 7 | 01/06/05 | Email by defendant HARD from s.t.hard@att.net to A.S. in Anaheim, California through the web-based email provider America Online in Dulles, Virginia |
| 8 | 01/09/05 | Email by defendant HARD from s.t.hard@att.net to A.S. in Anaheim, California at through the web-based email provider America Online in Dulles, Virginia |
| 9 | 01/12/05 | Email by defendant HARD from s.t.hard@att.net to A.S. in Anaheim, California through the web-based email provider America Online in Dulles, Virginia |

1        All in violation of Tile 18, United States Code, Sections
2   1343 and 2.

3

4                                  A TRUE BILL

5                                  _____/5)_____
6                                  FOREPERSON/

7

8   THOMAS P. O'BRIEN
    United States Attorney
9
    CHRISTINE C. EWELL
10  Assistant United States Attorney
    Chief, Criminal Division
11
12  [signature]
    ROBB C. ADKINS
13  Assistant United States Attorney
    Chief, Santa Ana Office
14

15

16  STEVEN A. TYRRELL
    Chief, Fraud Section
17  Criminal Division
    United States Department of Justice
18

19
    [signature]
20  JOEL E. LEISING
21  Senior Trial Attorney
    Criminal Division
22  United States Department of Justice

23

24

25

26

27

28                           14